**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

FILED BY [signature] D.C.

MAY 26 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**Case No. 1:25-cv-25796-DSW**

YSIDRA LOPENZA

(proceeding as "ANA MENDEZ"),

Plaintiff,

v.

PETRÓLEOS DE VENEZUELA, S.A.;

JUNTA ADMINISTRADORA AD HOC DE

PETRÓLEOS DE VENEZUELA, S.A.; and

CITGO PETROLEUM CORPORATION,

Defendants.

_______________________________________/

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HER**

**EXPEDITED MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

CITGO Petroleum Corporation's Opposition (ECF No. 32) mischaracterizes Plaintiff's motion at the threshold. Plaintiff does not seek a *Mareva*-style asset freeze of CITGO's general

operating funds; she does not seek to interfere with the *Crystallex* sale proceeding before Judge Stark in the District of Delaware. Plaintiff seeks the narrow equitable preservation of **specifically identifiable property** — property that CITGO's own sworn internal business records and a federal grand jury's findings have documented as derived from, or commingled with, misappropriated pension-trust assets. That request falls squarely within the constructive-trust framework that *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), expressly preserved and that the Eleventh Circuit recognizes in *Mitsubishi International Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1518 (11th Cir. 1994).

Three categories of specifically identifiable property are at issue: (a) the "$35 million reserved" pool documented in the May 31, 2017 email of Richard Lopez, CITGO's Vice President of Strategic Shareholder Relations (Bates PDVUSA_00005003; ECF No. 221-4 in SDNY 1:20-cv-03699); (b) the JPMorgan Chase account 633291682 through which $15 million flowed under the Rivera contract; and (c) the PDVSA ChinaCitic Bank account x0483 through which $25 million flowed from PDV Chalmette / PDV USA accounts at the express written instruction of CITGO Interim CEO Jose Pereira and processed by CITGO Assistant Treasurer Gina Coon. Each is documented by CITGO's own Corporate Audit Services Memorandum and the federal grand jury Indictment in *United States v. Rivera and Nuhfer*, No. 22-20552-CR-GAYLES/TORRES (S.D. Fla.) — returned by a federal grand jury sitting in this District.

The legal landscape has materially changed since CITGO's Opposition was filed. The likelihood-of-success analysis is now informed by precedential Third Circuit authority — *OI European Group B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157 (3d Cir. 2023), *cert. denied*, 144 S. Ct. 549 (2024) — adjudicating PDVSA as the alter ego of Venezuela in findings

that specifically trace Venezuela's governance authority into "PDV Holding, **CITGO**, and other affiliates." 73 F.4th at 172 (emphasis added). The irreparable-harm analysis is now anchored to a concrete date: **June 19, 2026** — when OFAC General License 5W's stay on PDVSA 2020 8.5% bondholder collateral enforcement against CITGO expires. And the federal regulatory framework — through OFAC General License 58 (May 5, 2026), incorporating Executive Order 13884 § 6(d)'s 50%-ownership definition of "Government of Venezuela" — continues to treat Venezuela, PDVSA, and PDVSA-owned entities (including CITGO) as economically integrated for federal sanctions purposes. The four-factor *Winter v. NRDC*, 555 U.S. 7 (2008), analysis uniformly favors Plaintiff.

## I. PLAINTIFF SEEKS A NARROW EQUITABLE PRESERVATION REMEDY, NOT A GRUPO MEXICANO ASSET FREEZE.

CITGO's central legal argument is that *Grupo Mexicano* and *Rosen v. Cascade International, Inc.*, 21 F.3d 1520 (11th Cir. 1994), bar Plaintiff's relief because she allegedly seeks only money damages. ECF No. 32 at 6-7. CITGO truncates both authorities. *Grupo Mexicano* held only that a court of equity cannot impose a general asset freeze to secure an eventual money judgment where the plaintiff is no more than an unsecured creditor. 527 U.S. at 319-23. The majority **expressly preserved** equitable remedies operating on specifically identifiable property in which the plaintiff asserts an ownership or lien interest. *Id.* at 322-26. That is the exact doctrinal posture of Plaintiff's motion.

The Eleventh Circuit framework governing this distinction is *Mitsubishi International*. Constructive trust is an equitable remedy that attaches to specifically identifiable property derived from, or commingled with, wrongfully obtained assets. 14 F.3d at 1518. It is not a money judgment; it is a vehicle for restoring identifiable property to its rightful owner through a trustee

relationship arising by operation of law where (i) a confidential or fiduciary relationship or wrongful conduct exists; (ii) the property is specifically identifiable or traceable; and (iii) equity requires imposition. *Provence v. Palm Beach Tav., Inc.*, 676 So. 2d 1022, 1025 (Fla. 4th DCA 1996); *Wadlington v. Edwards*, 92 So. 2d 629, 631 (Fla. 1957); *Saporta v. Saporta*, 766 So. 2d 379, 380 (Fla. 3d DCA 2000) (tracing applied where defendant commingled identifiable funds with other assets). Preliminary injunctive relief in support of constructive trust over specifically identifiable property is well-recognized in federal practice. *See Republic of the Philippines v. Marcos*, 806 F.2d 344, 355-56 (2d Cir. 1986) (affirming preliminary injunction in aid of constructive trust over property derived from wrongful conduct); *SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (preliminary asset preservation appropriate where plaintiff seeks equitable remedy over specifically identifiable property).

Plaintiff has affirmatively narrowed her requested relief to the three categories identified above. She does not seek: (i) a general asset freeze of CITGO's operating funds; (ii) any restriction on CITGO's day-to-day refinery operations; (iii) any order against CITGO's commercial counterparties; (iv) any injunction against the *Crystallex* sale itself — Judge Stark of the District of Delaware retains primary jurisdiction over that proceeding; or (v) any preliminary determination of ultimate liability on the merits. The Court may, in its discretion, structure the relief through bond, segregated account, or other preservation mechanism calibrated to the documented dissipation risk.

## II. PLAINTIFF HAS SHOWN SUBSTANTIAL LIKELIHOOD OF SUCCESS UNDER WINTER.

### A. The Likelihood-of-Success Analysis Is Now Controlled by Adjudicated Third Circuit Authority.

The most significant development affecting the likelihood-of-success analysis is the precedential Third Circuit decision in *OI European Group B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157 (3d Cir. 2023), *cert. denied*, 144 S. Ct. 549 (2024), affirming the underlying District Court decision of Judge Leonard P. Stark (sitting by designation) at 663 F. Supp. 3d 406 (D. Del. 2023). The Third Circuit adjudicated that "[c]onsidering the totality of Venezuela's control over PDVSA, it is clear PDVSA is Venezuela's alter ego." 73 F.4th at 170. The Court applied the five-factor *Bancec* test as articulated in *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822-23 (2018), and found that the relevant factors weighed in favor of an alter-ego finding.

Critically for the present action, the adjudicated record reaches the governance mechanism by which Venezuela's control of PDVSA descends to the very corporate chain at issue here: "Mr. Guaidó [is empowered] to appoint and remove an Ad Hoc Board of Directors to exercise rights as PDV Holding's shareholder, **including appointing and removing board members to PDV Holding, CITGO, and other affiliates**." 73 F.4th at 172 (emphasis added). The Court further found that "PDVSA's Ad Hoc Board acknowledges that it operates at the 'directives' of the Guaidó Government," *id.*, and that "Mr. Guaidó and his government regularly characterize PDVSA and its related assets, such as CITGO, as assets of the State." *Id.* at 174. In Footnote 21, the Third Circuit held in the alternative that "[e]ven if we were to disregard the lessons we have taken from the history of sovereign immunity and the FSIA and look only to the actions of the Guaidó Government, the result would not change." 73 F.4th at 174 n.21.

Plaintiff does not contend that *OI European Group* adjudicated CITGO Petroleum itself to be an alter ego of Venezuela — the holding reaches PDVSA. But the Third Circuit's specific findings concerning the Ad Hoc Board's appointment-and-removal authority over PDV Holding,

CITGO, and other affiliates supply the operative governance mechanism by which Venezuela's control of PDVSA descends through the corporate family to the CITGO Petroleum officers (Pereira, Coon) who actually processed the operative wires. CITGO's MTD and PI Opposition both argue that the post-2019 Ad Hoc Board structure created sufficient corporate independence to defeat alter-ego analysis. That argument is in serious tension with adjudicated Third Circuit authority that holds the alter-ego relationship persists across changes in administration and that specifically traces Venezuela's governance authority into CITGO via the Ad Hoc Board's appointment power.

**B. The Post-March 2026 Political Reality Empirically Vindicates the Adjudicated Architecture.**

The Third Circuit's adjudicated holding that the alter-ego relationship persists across administrative transitions has now been empirically confirmed. Following the January 3, 2026 United States military operation that captured Nicolás Maduro and removed him from power, Delcy Rodríguez was sworn in as Acting President of Venezuela on January 5, 2026. The United States Government formally recognized Rodríguez as the "sole Head of State, able to take action on behalf of Venezuela" through a Statement of Interest filed in federal court on March 10, 2026, citing a letter from State Department official Michael G. Kozak. *See* MercoPress, *U.S. formalizes before court its recognition of Delcy Rodriguez as Venezuela's state authority* (Mar. 12, 2026). The corporate-family architecture has not dissipated under the successor Administration; it has been operationally maintained.

On May 5, 2026, the United States Department of the Treasury's Office of Foreign Assets Control issued General License 58, providing limited authorization for transactions ordinarily incident to the provision of legal, financial advisory, and consulting services in connection with

potential debt restructuring of "the Government of Venezuela, including Petróleos de Venezuela, S.A. ('PdVSA') and any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest" (a definition encompassing CITGO Petroleum Corporation). *See* OFAC, *Recent Actions* (May 5, 2026), https://ofac.treasury.gov/recent-actions/20260505. While GL 58 is a limited services authorization rather than a recognition of alter-ego status — and expressly does not authorize "enforcement of liens or judgments against blocked property" or the underlying restructuring itself — the OFAC regulatory definition incorporated in GL 58 confirms that the Executive Branch continues to treat CITGO as economically subordinate to PDVSA for federal sanctions purposes. The same 50-percent ownership threshold underlies Executive Order 13884 § 6(d)'s definition of "Government of Venezuela," which includes "any person owned or controlled, directly or indirectly, by the foregoing." Across three successive Venezuelan administrations — Maduro, the Guaidó-recognized Ad Hoc Board, and the U.S.-recognized Rodríguez Administration — the federal regulatory framework has continued to treat the Venezuela-PDVSA-CITGO corporate family as economically integrated for sanctions purposes.

**C. CITGO's Own Audit Memorandum and the Federal Grand Jury's Findings Corroborate the Commingling Allegations.**

CITGO characterizes Plaintiff's claims as "frivolous," "unsupported by any non-conclusory factual allegations," and her commingling allegations as "makes no sense." ECF No. 32 at 2, 4. The integrated public record refutes each characterization.

CITGO's own Corporate Audit Services Memorandum, produced by CITGO and filed at ECF No. 232-1 in *PDV USA, Inc. v. Interamerican Consulting Inc.*, No. 1:20-cv-03699-JGK-RWL (S.D.N.Y.), Bates PDVUSA_00004756-4759 (unsealed Sept. 27, 2024), states at §1: "PDV USA (a PDVSA subsidiary **managed by CITGO Petroleum**

**Corporation)"** — a sworn admission by a party-opponent under Federal Rule of Evidence 801(d)(2). The Memorandum further finds at §3: "Legal, financial, compliance and credit reviews were not performed... **Gina Coon, CITGO Assistant Treasurer processed the wire transfers approved by CITGO Interim CEO Jose Pereira**... this override the normal process and delegation of authority (DoA) controls established at CITGO." And at §4: "process owners are still unclear of the nature of the services and if the services paid, were actually delivered/performed by Interamerican Consulting or David Rivera." These are CITGO's own auditors — not Plaintiff. CITGO cannot argue to this Court that operational integration and bypassed internal controls are "conclusory" when CITGO's own internal audit records document them in writing.

On November 16, 2022, a federal grand jury in this District returned the Indictment in *United States v. Rivera and Nuhfer*, No. 22-20552-CR-GAYLES/TORRES. The grand jury found probable cause that "CITGO was PDVSA's primary operating subsidiary in the United States" (Indictment ¶16); that the Rivera contract was "a draft one-page contract between Interamerican Consulting and CITGO" (Overt Acts ¶2); and that the $15 million flowed "through bank accounts controlled by CITGO and PDV USA" (Manner and Means ¶10). The Forfeiture Allegations seek $23,750,000.00 as proceeds of FARA and money-laundering offenses. ¶4(a). The Court can take judicial notice of the *existence and content* of these public-record allegations under Federal Rule of Evidence 201 — not for the truth of the matters charged, which await adjudication, but to recognize the matters that a federal grand jury has alleged in this very District. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-80 (11th Cir. 1999) (judicial notice of public records on Rule 12(b)(6) motion without conversion to summary judgment); *cf. United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (judicial notice limited to act

represented by an order). The Indictment's contents independently corroborate Plaintiff's well-pleaded allegations and constitute documentary evidence of the federal Executive Branch's parallel investigation into the same operative conduct. Together with the FARA-sworn admission by PDV Holding that "PDVSA's ownership of PDVH, in itself, may render PDVH an agent of the PDVSA Ad Hoc Board" (PDV Holding FARA Reg. No. 6997, Sept. 30, 2024, Item 12 Appendix), the record establishes substantially more than the *Twombly / Iqbal* plausibility floor.

**D. The Default of PDVSA and the Ad Hoc Board Operates as a Strategic Lever.**

On May 11, 2026, the Clerk entered default against PDVSA and the Ad Hoc Board for failure to appear within the FSIA 60-day response period under 28 U.S.C. § 1608(d) (ECF No. 29). As a procedural matter, the well-pleaded factual allegations of the Verified Complaint are deemed admitted as to those Defendants — including the corporate-family alter-ego allegations and the misappropriation allegations — subject to the limitations of *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975), which qualifies that default does not establish conclusions of law. [PRO SE NOTE: Plaintiff acknowledges that 28 U.S.C. § 1608(e) further requires, before entry of any default *judgment* against a foreign state or its agency or instrumentality, that "the claimant establishes his claim or right to relief by evidence satisfactory to the court." For purposes of the present preliminary-injunction motion, no default judgment is sought; the entry of default establishes only the procedural posture and the limited evidentiary weight of unrefuted well-pleaded factual allegations. The integrated documentary record — CITGO's own Audit Memorandum, the federal grand jury's findings, and the FARA-sworn admissions — independently provides the evidentiary support § 1608(e) will require at any subsequent default-judgment hearing.] The defaulting Defendants have effectively conceded the alter-ego architecture; CITGO's position that it should be treated as doctrinally separate is in

tension with the deemed-admitted allegations and with the adjudicated Third Circuit authority of *OI European Group*.

**E. The Continuing-Tort Framework and Fraudulent Concealment Defeat Any Limitations Defense.**

CITGO contends Plaintiff's claims are "plainly barred" by the four-year limitations period. ECF No. 32 at 4. The contention fails on two independent grounds. First, under Florida continuing-tort doctrine, where wrongful conduct continues over time the limitations period runs to the date the tortious conduct ceases. *Effs v. Sony Pictures Home Entm't, Inc.*, 197 So. 3d 1243, 1245 (Fla. 3d DCA 2016) (continuing tort "established by continual tortious acts, not by continual harmful effects from an original, completed act") (quoting *Suarez v. City of Tampa*, 987 So. 2d 681, 686 (Fla. 2d DCA 2008)); *see also Pearson v. Ford Motor Co.*, 694 So. 2d 61 (Fla. 1st DCA 1997); *Halkey-Roberts Corp. v. Mackal*, 641 So. 2d 445 (Fla. 2d DCA 1994). The wrong alleged is not a discrete 2002-2003 act with continuing harmful effects, but a course of *continual tortious acts* in the administration of the pension corpus through the corporate-family architecture, with documented acts within any limitations period: PDV Holding's FARA filing of September 30, 2024; the V&E FARA filing of December 10, 2024; the Rakoff intervention order of February 11, 2025; and the ongoing FARA-disclosed disbursements ($580,701.12 in a single six-month reporting period). Second, fraudulent concealment provides an independent equitable-tolling basis under Florida law. Where a defendant by affirmative conduct conceals a cause of action through fraudulent means, the limitations period is tolled until the plaintiff discovers, or through reasonable diligence should have discovered, the cause of action. *Nardone v. Reynolds*, 333 So. 2d 25, 36-37, 39 (Fla. 1976), holding modified on other grounds by *Tanner v. Hartog*, 618 So. 2d 177 (Fla. 1993); *see also Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809,

811 (Fla. 4th DCA 1995). The Florida Legislature has additionally codified delayed accrual for fraud-based actions at Fla. Stat. § 95.031(2)(a) (period runs from discovery of facts giving rise to fraud cause of action, subject to twelve-year repose). [PRO SE NOTE: Plaintiff acknowledges that *Davis v. Monahan*, 832 So. 2d 708, 710-12 (Fla. 2002), substantially narrowed the *delayed discovery* doctrine outside enumerated statutory categories. Plaintiff invokes fraudulent-concealment *tolling* under *Nardone* — a distinct equitable doctrine that *Davis v. Monahan* did not disturb — together with the statutory delayed-accrual rule for fraud-based actions under Fla. Stat. § 95.031(2)(a). The instant claim sounds in fraud and constructive fraud and thus falls within § 95.031(2)(a)'s express delayed-accrual scope.] The CITGO Audit Memorandum was sealed from 2017 through September 27, 2024; the Rivera Indictment was sealed at filing; the V&E FARA filing was not filed until December 10, 2024. Plaintiff is pro se and lacks investigative counsel.

## III. IRREPARABLE HARM IS CONCRETE AND IMMINENT — THE JUNE 19, 2026 OFAC GL 5W EXPIRATION.

### A. The June 19, 2026 OFAC GL 5W Expiration Is the Operative Imminent-Harm Anchor.

CITGO contends Plaintiff has shown "no evidence that CITGO will dissipate or hide assets," citing *Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000). ECF No. 32 at 7. The factual record is decisively to the contrary, and is anchored to a concrete date that this Court can take judicial notice of under Federal Rule of Evidence 201.

On May 4, 2026, the United States Department of the Treasury's Office of Foreign Assets Control issued General License 5W, extending until **June 19, 2026** the date on which holders of the PDVSA 2020 8.5% bond may engage in otherwise-prohibited transactions related to the

bond's CITGO-collateral. *See* 31 C.F.R. § 591.510(c); OFAC, Venezuela-Related Sanctions, General License 5W (May 4, 2026). The practical effect is that **on or after June 19, 2026**, PDVSA 2020 bondholders may move to enforce their lien on the CITGO collateral — putting Plaintiff in direct competition with sophisticated institutional creditors who hold a contractual lien interest.

The Crystallex sale proceeding compounds the timeline. On November 25, 2025, Judge Stark approved the recommendation of the Special Master accepting Amber Energy Inc.'s $5.9 billion bid for the PDVH shares; final sale order entered November 29, 2025. The sale closing is stayed only until "no earlier than seven (7) days after the Special Master dockets a notice indicating that OFAC has granted such a license, all other regulatory and other necessary approvals have been obtained, and the Sale Transaction is ready to close." Multiple parties (including Gold Reserve Ltd.) have filed appeals to the Third Circuit; briefing is complete and the parties expect the Third Circuit to set oral argument in due course. Once OFAC grants the closing license and the Third Circuit affirms, the sale will administratively distribute the corporate-family-asset pool among Crystallex priorities — priorities that do not recognize Plaintiff or the absent 18,000-worker class as pension creditors. The distribution is administratively unwindable. *See Café 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136 (11th Cir. 1993) (preliminary injunction is "drastic remedy" — applied here for imminent administrative dissipation of identifiable property).

**B. CITGO's Own Auditors Document the Dissipation Risk Within CITGO Itself.**

Independent of the Crystallex sale and the June 19 GL 5W expiration, CITGO's own auditors document the dissipation risk within CITGO. The Audit Memorandum's §3 finds that CITGO's own Chief Executive directed wires "on an expedited basis" in bypass of CITGO's

internal Legal, Financial, Compliance, and Credit reviews — "this override the normal process and delegation of authority (DoA) controls established at CITGO." The Memorandum's §4 Recommendations remain redacted as a solid black box — eight years and counting — itself evidence of corporate-family opacity. When a defendant's own auditors document that internal controls were bypassed at its Chief Executive's direction, the defendant cannot credibly argue "no evidence" of dissipation risk. Plaintiff's narrow preservation request — bond, segregated account, or other equitable preservation calibrated to three identified categories of property — is proportionate to that documented risk.

**C. Post-June 19 Recovery Becomes Practically Impossible.**

The structural reality after June 19, 2026 is decisive. Once GL 5W's stay expires: (i) PDVSA 2020 bondholders may move to enforce their contractual lien on CITGO Holding shares — placing Plaintiff in competition with creditors holding documented liens; (ii) the Crystallex sale closing, once cleared by OFAC license and the pending Third Circuit appeal, will distribute proceeds in priority order to *Crystallex*-recognized judgment creditors, none of whom recognize Plaintiff's pension claim; and (iii) the assets in the three identified categories of property — the "$35 million reserved" pool, the JPMorgan account 633291682 transactions, and the ChinaCitic Bank x0483 transactions — may be dissipated, transferred, or commingled beyond traceability. Once the assets are administratively dissipated through these mechanisms, no monetary judgment in this Court can restore them. Equitable preservation is necessary to preserve the Court's ability to grant meaningful relief.

**IV. FREITES v. CITGO HOLDING IS DISTINGUISHABLE ON FOUR INDEPENDENT GROUNDS.**

CITGO cites *Freites C. v. CITGO Holding, Inc.*, No. C.A. 23-989-JLH, 2025 WL 3654006 (D. Del. Dec. 17, 2025) (Hall, J.), for the proposition that alter-ego claims against CITGO are foreclosed. ECF No. 32 at 6. The decision is distinguishable on four independent grounds. **First**, the *Freites C.* dismissal is a recent District Court ruling that has not yet received appellate review and is not final precedent; any appeal from D. Del. would lie to the Third Circuit. **Second**, three of the *Freites C.* plaintiffs filed a re-architected federal complaint in the District of Delaware on May 23, 2026, expressly designed to address court-identified pleading defects — demonstrating that the dismissal is a procedural lesson, not a substantive bar. **Third**, the *Freites C.* dismissal addressed claims against CITGO Holding, Inc. — the corporate parent — not against CITGO Petroleum Corporation, the operating subsidiary that is the Defendant here. The integrated documentary record at issue in this action (the Audit Memorandum's **"managed by CITGO Petroleum Corporation"** admission; the grand jury's **"through bank accounts controlled by CITGO and PDV USA"** finding; the wire-execution conduct of CITGO Petroleum officers Pereira and Coon) is specific to CITGO Petroleum, not CITGO Holding. **Fourth**, the *Freites C.* operative complaint expressly disclaimed reliance on alter-ego theory (Operative Complaint ¶¶ 71, 76, 79); here, by contrast, Plaintiff's Count VI (constructive trust) requires no veil-piercing because the operative wires were processed by CITGO Petroleum's own treasury function. CITGO Petroleum is liable for its own conduct, not derivatively through veil-piercing.

More fundamentally, the adjudicated Third Circuit authority in *OI European Group* — which post-dates and was not before Judge Hall in *Freites C.* — supports the broader proposition that, while the alter-ego adjudication runs Venezuela→PDVSA, the Ad Hoc Board's appointment-and-removal authority "to PDV Holding, CITGO, and other affiliates," 73 F.4th at

172, supplies the operative governance mechanism by which Venezuela's control of PDVSA descends through the corporate family to CITGO Petroleum's own treasury function.

## V. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR NARROW PRESERVATION RELIEF.

Under the third and fourth *Winter* factors, the balance of equities and public interest decisively favor Plaintiff. The harm to Plaintiff absent preliminary relief is the permanent administrative dissipation of identifiable property in which she — as one of approximately 18,000 workers entitled to *prestaciones sociales* under Venezuelan Organic Labor Law Article 108 (LOT 1997) — asserts an equitable ownership interest. The harm to CITGO from the narrow relief Plaintiff seeks is minimal: CITGO represents to the Court that it is "a solvent, multi-billion-dollar refiner." ECF No. 32 at 2. Preserving three identifiable property categories documented in CITGO's own records does not threaten CITGO's refinery operations, workforce, commercial relationships, or solvency. The balance tilts decisively: Plaintiff stands to lose all if the property is dissipated; CITGO stands to lose nothing of operational significance if the property is preserved.

The public interest is served by preservation. Congress — through the Foreign Agents Registration Act (22 U.S.C. § 611 *et seq.*), the federal money-laundering statutes (18 U.S.C. §§ 1956, 1957), and OFAC sanctions under Executive Order 13884 — and the United States Department of Justice, through the parallel federal criminal prosecution in *U.S. v. Rivera and Nuhfer* before this very District, has identified the corporate-family-and-foreign-principal payment architecture as a matter of substantial public concern. The post-March 2026 issuance of OFAC General License 58 — incorporating Executive Order 13884 § 6(d)'s 50%-ownership definition that encompasses CITGO within the regulatory perimeter of "Government of

Venezuela" for sanctions purposes — confirms that the Executive Branch continues to treat the operative corporate-family architecture as economically integrated. Preliminary preservation of identifiable property reinforces rather than disrupts that federal framework. It serves the orderly administration of complex multi-jurisdictional federal litigation by preventing dissipation that would foreclose effective adjudication in this Court and in parallel federal proceedings.

The harm to Plaintiff is also amplified by her vulnerable posture. Plaintiff proceeds pro se under court-authorized pseudonym (Pseudonym Protective Order, ECF No. 3). She has no investigative counsel. The defendants she is most likely to recover from — PDVSA and the Ad Hoc Board — are in default; their assets are subject to the Crystallex sale and the post-June 19 PDVSA 2020 bondholder enforcement. The corporate-family-recognized U.S. counsel of those defendants includes Vinson & Elkins LLP (FARA Reg. No. 7498, $584,000 retention dated December 13, 2024) and White & Case LLP (engagement letter dated May 20, 2022). Plaintiff faces a sophisticated multi-jurisdictional litigation architecture without counsel. Equitable preservation is the only meaningful remedy this Court can grant that preserves the practical possibility of recovery.

**CONCLUSION**

All four *Winter* factors uniformly favor Plaintiff. Likelihood of success is established by adjudicated Third Circuit authority on Venezuela-PDVSA alter-ego and the corporate-family governance mechanism reaching CITGO, the federal grand jury's findings in this District, CITGO's own internal audit records, the FARA-sworn corporate-family admissions, the default of PDVSA and the Ad Hoc Board, and the federal regulatory framework continuing to treat the Venezuela-PDVSA-CITGO corporate family as economically integrated through OFAC General License 58 and Executive Order 13884 § 6(d). Irreparable harm is concrete and imminent —

anchored to the June 19, 2026 OFAC GL 5W expiration and the impending closure of the Crystallex sale once OFAC license issues and Third Circuit appellate review concludes. The balance of equities tilts decisively in favor of preserving three specifically identifiable property categories documented in CITGO's own records. The public interest is served by preservation of pension assets belonging to approximately 18,000 Venezuelan oil workers.

For the foregoing reasons, the Court should (i) **DENY** CITGO's Opposition; and (ii) **GRANT** Plaintiff's narrowly tailored Motion for Preliminary Injunction by imposing a constructive trust under *Mitsubishi International*, 14 F.3d at 1518, over the three categories of specifically identifiable property identified above, structured through bond, segregated account, or other equitable preservation mechanism the Court deems appropriate.

Respectfully submitted,

Dated: May 26, 2026

Ysidra Elena Lopenza

______________________________

YSIDRA LOPENZA

(proceeding as "ANA MENDEZ")

Plaintiff, Pro Se

(Service address on file under seal pursuant to

the Court's Pseudonym Protective Order, ECF No. 3)

Telephone: [Plaintiff to insert]

Email: Ana.Mendez.Florida@proton.me

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 26, 2026, I filed the foregoing Plaintiff's Reply Memorandum in Support of Her Expedited Motion for Preliminary Injunction conventionally

with the Clerk of the United States District Court for the Southern District of Florida pursuant to Section 2C of the CM/ECF Administrative Procedures, which will cause notice of filing to be transmitted to all counsel of record. I further certify that a true and correct copy of the foregoing was served via United States Mail, first-class postage prepaid, addressed as follows:

Petróleos de Venezuela, S.A.

Junta Administradora ad hoc de Petróleos de Venezuela, S.A.

c/o Horacio Medina, Chair

2216 Adams Street, Apartment 307

Hollywood, FL 33020

(the address sworn as the foreign principal's address in Vinson & Elkins LLP's FARA Registration No. 7498, Exhibit A, filed December 10, 2024)

Greg J. Weintraub, Esq.

Lash Goldberg Fineberg LLP

100 Southeast Second Street, Suite 1200

Miami, FL 33131

Nathan P. Eimer, Esq.

Daniel D. Birk, Esq.

Eimer Stahl LLP

224 South Michigan Avenue, Suite 1100

Chicago, IL 60604

Ysidra Elena Lopenza

YSIDRA LOPENZA

(proceeding as "ANA MENDEZ"), Plaintiff Pro Se

Page of